**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**ANTHONY GUNTER,**

    **Plaintiff,**

**v.**

**ALUTIIQ ADVANCED SECURITY**
**SOLUTIONS, LLC,**

    **Defendant.**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**Case No. 1:20-CV-03410-JRR**

## <u>MEMORANDUM OPINION</u>

Pending before the court is the Motion for and Memorandum in Support of Motion for Fees and Costs Arising from Order of Sanctions (ECF No. 71) filed by Defendant Alutiiq Advanced Security Solutions, LLC ("Alutiiq"), Plaintiff Anthony Gunter's sealed submissions in response (ECF Nos. 73 and 75), Defendant's response in opposition to Plaintiff's sealed submissions (ECF No. 74), as well as Defendant's Supplemental Memorandum in Support of Dismissal as a Sanction (ECF No. 81). For the reasons described below, the court has also determined, *sua sponte,* to reconsider its ruling on Defendant's Motion for Sanctions and Dismissal at ECF No. 50, and, therefore, likewise reconsiders its ruling on Magistrate Judge J. Mark Coulson's Report and Recommendation on ECF No. 50. (ECF No. 53).

For the reasons set forth herein, by separate order, the court vacates its order at ECF No. 68; adopts in part and modifies in part the Report and Recommendation at ECF No. 53; upon *sua sponte* reconsideration, grants the Motion at ECF No. 50; grants in part and denies in part the Motion for Fees and Costs Arising from Order of Sanctions (ECF No. 71); directs Plaintiff to pay $10,000.00 to Defendant as partial reimbursement of costs associated with the engagement of forensic and expert witness services; dismisses this action with prejudice as a sanction for

Plaintiff's misconduct and fraud upon the court; and respectfully directs Madam Clerk to close this case.

## I.    <u>INTRODUCTION</u>

Much has been written and resides in the court's record documenting the background of the parties' relationship and Plaintiff's action for relief related to alleged wrongful termination and employment-related wrongs; the court will not duplicate that effort here.  This memorandum does not pertain to the merits of the action.  Rather, this memorandum pertains to Plaintiff's fraud upon the court and spoliation of evidence, and determination of the appropriate sanction for this misconduct.

Defendant's Motion and Memorandum at ECF No. 71 arises from Defendant's Motion for Sanctions and Dismissal at ECF No. 50.  The Motion at ECF No. 50 is based on Defendant's allegations that Plaintiff produced fraudulent text messages in support of his action and otherwise spoliated evidence (other text messages).  Several days before Defendant filed its Motion at ECF No. 50, the court (Judge Richard D. Bennett then presiding), having been made aware of the discovery dispute at issue in the Motion at ECF No. 50 (and as described in detail below), referred the matter to Magistrate Judge J. Mark Coulson for resolution of all discovery disputes.  (Referral Order at ECF No. 45.)  Because the Motion at ECF No. 50 requests dispositive relief as a sanction for Plaintiff's discovery misconduct (as opposed to discovery-related relief), Judge Coulson issued a Report and Recommendation for the court's consideration in ruling on the Motion at ECF No. 50.  (Report and Recommendation at ECF No. 53.)

As set forth in his Report and Recommendation, Judge Coulson found the authenticity of Plaintiff's (later found fraudulent) text messages implausible, but concluded that determinations of authenticity under Federal Rules of Evidence 901 and 902 are properly left to the discretion of

the trial judge (at the time, Judge Bennett).  Further, Judge Coulson reasoned that "to the extent Defendant relies on the contents of the text recipient's[1] cell phone to dispute the authenticity of the text messages, or the fact that they are now missing from Plaintiff's cell phone, there is insufficient forensic evidence to allow the Court to conclude there was fabrication. Proof or implication of such fabrication would require evidence akin to verification that the metadata from the recipient's phone rules out any deletion or manipulation, and, as to Plaintiff's phone, the time, date, and circumstances of the deletion, the lack of damage to the cell phone, or the true data over-writing practices of the cell phone carrier." (ECF No. 53 at p. 7.)  In the absence of such evidence of fabrication, Judge Coulson opined that Plaintiff would not likely be able to meet the standard of admissibility at trial, but declined to conclude that the messages were fraudulent; he did, however, conclude that Plaintiff had failed to produce other text messages.  These missing text messages were discovered by Defendant only upon obtaining a forensic copy of Plaintiff's cell phone, which Judge Bennett authorized Defendant to obtain.  Specifically, following a telephone conference with the parties' counsel in the middle of Plaintiff's deposition testimony, Judge Bennett ordered Plaintiff to turn over his cell phone that very day for forensic examination. (ECF No. 39.)

Approximately two months following Judge Coulson's Report and Recommendation, Defendant filed a status report with the court attaching the report of its expert forensic examiner, J. Christopher Racich of Vestigant LLC.  Mr. Racich opined that Plaintiff had "targeted for deletion" the missing text messages[2] and that certain text messages Plaintiff relied on to support his claims

---

[1] Zachary Caster, Plaintiff's former supervisor during his employment at Defendant Alutiiq.
[2] Mr. Racich further opined that these messages were "deleted" after the date on which Plaintiff filed his Charge of Discrimination with the EEOC (out of which this action arises). At his deposition, Plaintiff admitted he had deleted these text messages despite the fact that they were responsive to Defendant's Rule 34 document requests; and he agreed that he deleted these messages after he filed his EEOC Charge of Discrimination against Defendant. (Gunter Depo., ECF No. 50-6, at pp. 171-72.)

(and which Judge Bennett later found are "in fact fraudulent") were "not genuine and were altered." (Expert Report of J. Christopher Racich of February 28, 2022, at ECF No. 58-1, p. 18; J. Bennett's Memorandum Opinion at ECF No. 67.)

Upon receipt of Mr. Racich's report, Judge Bennett held an evidentiary hearing on the Motion for Sanctions and Dismissal (ECF No. 50).  (*See* order at ECF No. 59 scheduling hearing for April 14, 2022.)  At the hearing on April 14, 2022, Defendant called Mr. Racich to testify. Judge Bennett recognized Mr. Racich as "an expert in the area of forensic examination of metadata" and, per Rule 702, allowed him to testify regarding "his expert opinion with respect to matters at issue as to the text messages in this matter."  Plaintiff did not call any witnesses, but did cross-examine Mr. Racich and make oral argument opposing the Motion at ECF No. 50.

Fortified with the expert opinion of Mr. Racich, which Judge Coulson had not had the benefit of, Judge Bennett adopted in part and modified in part Judge Coulson's Report and Recommendation, and, based on that, granted in part and denied in part Defendant's Motion for Sanctions and Dismissal at ECF No. 50.  (Memorandum Opinion and Order at ECF Nos. 67 and 68, respectively.)  Specifically, the court found that Plaintiff produced and relied upon "fraudulent" text messages dated July 29, 2019 and August 20, 2019, in support of his claims.  (*See* fraudulent text messages at ECF Nos. 50-2 and 50-4.)  Further, while not the central focus of the court's ruling, Judge Bennett implicitly accepted and credited Mr. Racich's expert opinion that Plaintiff had spoliated (in Mr. Racich's words, "targeted for deletion") six text messages dated August 31 to September 5, 2019.  (*See* deleted text messages obtained through forensic examination of Plaintiff's cell phone at ECF No. 50-1 and 9-11.)

Judge Bennett found that Plaintiff's fraudulent conduct was "egregious."[3] As a sanction for Plaintiff's fraud upon the court, Judge Bennett exercised his discretion not to dismiss Plaintiff's case, but rather to constrain Plaintiff's presentation of evidence at trial. Specifically, Judge Bennett ordered that Plaintiff may not introduce in evidence the fraudulent messages and that Defendant may use them at trial to impeach Plaintiff's credibility. Judge Bennett further ordered that Plaintiff reimburse Defendant "for the cost of the September 10, 2021 forensic download of his phone and for the cost of engaging the services of J. Christopher Racich" subject to Plaintiff's demonstration of an inability to pay should he so contend. (ECF Nos. 67 and 68.) To that end, Judge Bennett ordered that Defendant file a fee petition and that Plaintiff file under seal documents demonstrating his incapacity to pay (if he so contends). (ECF No. 68.) Defendant's Motion at ECF No. 71 is that fee petition. Plaintiff filed documents contesting his capacity to pay per Judge Bennett's order to which Defendant responded. (ECF Nos. 73-75.)

On April 29, 2022, a few weeks before the parties filed their papers regarding the fee petition and Plaintiff's capacity to pay (ECF Nos. 71, 73-75), this action was transferred to the undersigned to preside as the judge from that moment forward. In preparing to evaluate and rule on the pending fee petition at ECF No. 71 (and related submissions at ECF Nos. 73 through 75), the court endeavored to learn the record of the case, and, to that end, undertook to read the docket fairly in its entirety given the gravity of the findings that led the parties and the court to this point.

As the judge to whom this action was transferred, and upon review of the record, the undersigned convened an on-the-record status conference on October 6, 2022, to advise the parties

---

[3] Citing to *Davis v. Crescent Elec. Co.,* No. CIV 12-5008, 2016 U.S. Dist. LEXIS 53241, 2016 WL 1625291, at *3 (D.S.D. Apr. 21, 2016) (holding that "[s]ubmitting a false discovery document—or fabricating evidence—has been referred to as 'the most egregious misconduct which justifies a finding of fraud upon the Court.'") (citations omitted).

that the court was considering whether to revise its ruling on ECF Nos. 50 and 53.[4]  (Order scheduling conference at ECF No. 77; transcript of conference at ECF No. 84.)  In order to ensure that the parties had a fulsome and proper opportunity to be heard, the court set a briefing schedule and invited the parties, if they wished, to submit supplemental papers as to their respective positions on the appropriate sanction for Plaintiff's conduct.  (Letter order at ECF No. 80; transcript of conference at ECF No. 84.)  Defendant filed supplemental papers at ECF No. 81. Plaintiff did not file papers per the voluntary briefing schedule; instead, Plaintiff filed a Motion for Recusal at ECF No. 79, which the court denied by order at ECF No. 83.  Although the court denied Plaintiff's requested recusal, the court has considered the substance of the Motion for Recusal in connection with this memorandum opinion, because the substance of the motion addresses whether the court may, or should, reconsider the court's ruling on the Motion for Sanctions and Dismissal at ECF No. 50.

---

[4] At the hearing on April 14, 2022, Plaintiff told Judge Bennett: **"[T]he government [the Department of Homeland Security] fully supports this lawsuit."**  Judge Bennett responded, "[T]hat is absolutely not a correct statement of law, Mr. Gunter. . . . As a matter of fundamental law, that is not correct on the record for you to suggest that someone has sanctified your lawsuit and supports your theory in this matter. . . . I'm not going to permit you to make false statements of that ilk and try to put things on the record that are not true.  What you just said is not correct.  Do you acknowledge that now?"  Mr. Gunter responded, "Your Honor, you're correct that I worded it wrong."

Despite Judge Bennett's robust admonishment, and Plaintiff's dubious concession that he "worded it wrong," following transfer of the case to the undersigned, at the status conference held October 6, 2022, Plaintiff again misrepresented to the court that the federal government supports the merits of this action: "I want to say that **this case is supported by the Department of Homeland Security**. . . . So now, you know, if I've got the support of the Department of Homeland Security . . . ."  (Conference transcript, ECF No. 84 at p. 11.) (Emphasis added.)

The court is mindful that Plaintiff's misstatements to the court regarding DHS' support of his lawsuit are not at issue in the pending motions.  However, in view of the court's review of the record and contemplation regarding reconsideration of the appropriate sanction for Plaintiff's fraudulent conduct – including whether a sanction short of dismissal will adequately right the ship so that this matter may be heard on the merits – Plaintiff's ready willingness to misrepresent, a second time (to a new judicial audience), that DHS supports his case demonstrates that Plaintiff is either unable or unwilling to abide the fundamental, elementary requirement that he be candid, and not lie, to the court (or another party).  Further, against the backdrop of Judge Bennett's determination that Plaintiff engaged in a fraud on the court and in the context of this court's conference regarding possible reconsideration of the appropriate sanction for Plaintiff's misconduct, his unflinching and ready dishonesty to the court after having been instructed by Judge Bennett not to make such "false statements of that ilk" leaves this court rather gobsmacked. *See Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978) (holding that a Rule 41(b) dismissal with prejudice for failure to prosecute is a "harsh sanction which should not be invoked lightly in view of the 'sound public policy of deciding cases on their merits.'") (quoting *Reizakis v. Loy*, 490 F.2d 1132, 1135 (4th Cir. 1974)).

In addition to reading the record of the case generally, the court has examined all papers in support of and in opposition to ECF Nos. 50, 71 and 81; and has examined the Report and Recommendation at ECF No. 53, as well as the court's Memorandum Opinion and Order at ECF Nos. 67 and 68.  Further, the undersigned read the transcript of the evidentiary hearing of April 14, 2022, listened to the entire audio recording of same, and has read the Report of Mr. Racich at ECF No. 58-1.

## II.   RELEVANT SUBSTANTIVE BACKGROUND

On August 25, 2021, Plaintiff filed an eight-count Fourth Amended Complaint (the "Complaint") raising various employment-related claims against Defendant Alutiiq.  (ECF No. 35.) The Complaint sets forth the following causes of action: retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*. (Count One); discrimination in violation of the ADEA (Count Two); hostile work environment in violation of the ADEA (Count Three); retaliation in violation of the Maryland Fair Employment Practices Act ("MFEPA"), MD. CODE ANN., STATE GOV'T §§ 20-602 *et seq*. (Count Four); discrimination in violation of the MFEPA (Count Five); hostile work environment in violation of the MFEPA (Count Six); retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count Seven); and whistleblower retaliation in violation of the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 2409 (Count Eight).

On September 10, 2021, Alutiiq took Mr. Gunter's deposition.  During the deposition, defense counsel questioned Mr. Gunter about certain text messages he had produced in response to Alutiiq's Rule 34 document requests.  Specifically, Mr. Gunter had deleted portions of texts

messages between him and his Alutiiq supervisor, Zachary Caster, that Mr. Gunter expressly relied

upon in support of his claims:[5]

> Q And then there's a blank space again and then another line that's kind of cut off; right?
>
> A Yes.
>
> Q That means you left out some text messages; right?
>
> A For the purpose of this deposition, you can say yes.
>
> Q It's not whether it's for purposes of this deposition or not. It's just what happened. You just did not include certain text messages, correct, because you didn't think they were relevant?
>
> A You can say yes.
>
> Q It's not for me to say. I'm not testifying. It's what happened? Is that what happened? You chose not to include certain text messages because you didn't think they were relevant?
>
> A Yes.
>
> Q Okay. And then the next portion of the message says "care of her."  What's that about?
>
> A I don't know off the top of my head, sir.
>
> Q Okay. And again another line meaning left off some more text messages. That's going to be the theme of this page; right?
>
> A Okay.
>
> Q Is that correct?
>
> A Yes, sir.
>
> Q And then the next text message says "So your just going to ignore my request for FMLA for my mother really where's the paperwork whatever I talked to that lady in HR in Alaska also the IG about those time cards you keep falsifying?"
>
> A Yes.
>
> Q And there's no dates or times for any of these text messages, are there?
>
> A There is a date at the top.
>
> Q Yes, but for every other page, there's dates and times for text messages, but for whatever reason there's not dates or times for these text messages?
>
> A Okay.
>
> Q Correct?
>
> A Yes.
>
> Q And then again there's blank space and then there's sort of like little tiny marks that look like something was there, but you didn't completely cover it up or something; is that right?
>
> A No, sir, no.
>
> Q What are those marks?
>
> A I don't know.

---

[5] As referenced in the Introduction, Mr. Gunter admitted these apparent deletions were made following his administrative Charge of Discrimination while he was under a duty to preserve, and not spoliate, relevant materials. (Gunter Depo., ECF No. 50-6, at pp. 171-72.)

Q And then there's another line where you obviously, again, exclude text messages that you thought were not relevant to this case; correct?

A Yes.

Q And then the next text message says "Hey Captain[6] the other day when we were talking at the gate, I told you about my mother's alzheimers. So I need the paperwork for FMLA, I need like a couple of weeks off to take care of her situation," and then it's cut off with another portion of a line; correct?

A Yes.

Q And then at the bottom, it says "Yeah ok your shift will be covered."?

A Okay.

Q But there are lines between the message header -- the top of the message header and the bottom of the message header; correct?

A Correct.

Q Meaning, again, something was cut off in between those?

A Okay.

Q Yes?

A Yes, sir.

(Gunter Depo., ECF No. 50-6, at pp. 156-59.)

As an apparent alternative theory to explain the missing text message passages, Mr. Gunter suggested that Verizon erased them: "A lot of these old text messages get deleted by Verizon, not me."  He was unable to explain, however, how or why Verizon deleted only select passages of the adulterated messages.  (Gunter Depo., ECF No. 50-6, at pp. 26, 150-52, 176.)

Mr. Gunter was also questioned as to material distinctions between text messages produced by Mr. Gunter (purporting to be texts between him and Mr. Caster), and text messages retrieved from Mr. Caster's telephone covering the same send/receipt date and time.  For example, Mr. Gunter produced a text message (marked Gunter 0012 at ECF Nos. 50-2) regarding Mr. Gunter's desire to be a site supervisor.  In Mr. Gunter's version of the message, Mr. Caster tells Mr. Gunter that whether he (Mr. Gunter) gets the position is out of his (Mr. Caster's) hands and ". . . I've told them about the [Inspector General] investigation."  In the version of this text message retrieved from Mr. Caster's telephone (marked AASS935 at ECF No. 50-3), Mr. Caster tells Mr. Gunter,

---

[6] "Captain" refers to Mr. Caster.

"I've told them you've been pretty straight" – referencing the site supervisor decisionmakers.  Mr. Gunter expressly quotes his version of this text message in his Complaint in support of his claims, including specifically retaliation.  (Fourth Amended Complaint, ECF No. 35, at ¶ 55.)

Mr. Gunter also produced a text message in which Mr. Gunter supposedly tells Mr. Caster that he needs Family and Medical Leave Act benefits:

> *Mr. Gunter*:  . . . I already told you that I needed to take FLMA because my mother keeps coming up missing and my family is trying to get her in a program until then i have to take care of her
>
> So your just going to ignore my request for FMLA for my mother really where's the paperwork whatever I talked to that lady in HR in Alaska also the IG about those time cards you keep falsifying
>
> . . . the other day when we were talking at the gate,I told you about my mother's alzheimers. So I need the paperworkfor FMLA, I need like a couple of weeks off to take care of her situation,
>
> *Mr. Caster*: Yeah ok your shift will be covered.

(Gunter 0013 at ECF No. 50-4.)

The text message sent by Mr. Gunter and retrieved from Mr. Caster's phone covering the same date and time reads simply: "I called u to call out sick."  (AASS936 at ECF No. 505.)

During his deposition, when asked whether he had an explanation for the dramatic text message variance, Mr. Gunter disavowed knowledge and suggested that covert government agents were responsible.  He testified that "Department of Homeland Security special agents" "from headquarters in Washington, D.C." arrived at his home to "seize[] my phone."  According to Mr. Gunter, once the special agents seized his phone: "[t]hey park a van, you know a suspicious vehicle, and what they're doing inside I'm not privy to."  (Gunter depo., ECF No. 50-6, at pp. 170, 178.)

Mr. Gunter went on to challenge counsel for Alutiiq to "prove it" – referencing counsel's implicit suggestion that Mr. Gunter was responsible for the text message variance:

> Q You didn't change the language to say "about the IG investigation?"
> A No, I did not, sir.
> Q You are under oath and you are subject to the rules of perjury –
> A I understand that.
> Q – so I want you to take your time before you answer, it's very serious –
> A Yes.
> Q – you may want to think before you answer. Don't just answer so quickly, because what I will tell you, I'm just cautioning you, oftentimes people get into very serious trouble trying to hide something they've done rather than admit they were wrong and move on from it. . . . I just caution you you're under oath and you're subject to the rules, the criminal rules of perjury, and it's a very serious matter, so I'm going to give you a chance to think about it before you answer. Did you change the language in the text message to say "about the IG investigation?"
> A No.
> Q I suggest you take a moment to think about that. Really think about whether or not you want to subject yourself to the rules. You would be lying if we find out that it's true.
> A Sir, first of all, that's an accusation and your opinion. Second of all, you've got my phone, if you have a way of proving it, I invite you to do so, but my answer is no.
> Q But you don't have any explanation for how  it could be that they're different?
> A No, because I'm not psychic.

Still later, Mr. Gunter answered: "You're fishing and there's no fish." (Gunter Depo., ECF No. 50-6, at pp. 150-52.)

Importantly, at the start of his deposition, Mr. Gunter testified that he was aware of his duty to preserve evidence, understood that he was under oath, that he was "quite familiar" with the criminal law on perjury, and that he had produced all text messages between him and Mr. Caster responsive to Alutiiq's Rule 34 requests. (Gunter Depo., ECF No. 50-6, at pp. 25, 26-27.)

While still on site at Mr. Gunter's deposition, counsel for the parties engaged in a telephonic, off-record conference with the court[7] regarding Alutiiq's concerns of spoliation and manipulation of evidence by Mr. Gunter.  During the conference, Alutiiq expressed its desire to engage a forensic examiner to make a forensic copy of Mr. Gunter's cell phone for analysis of same.  Immediately following the conference, Judge Bennett issued a Letter Order at ECF No. 39.

---

[7] Judge Richard D. Bennett was the judge then presiding over this case.  It was later transferred to the undersigned in April 2022.  *See* Introduction, *supra.*

The Letter Order summarizes the conference and provides that "the Court shall allow a forensic analysis of Plaintiff's personal cell phone to be performed **today, September 10, 2021** . . . . (ECF No. 39; emphasis in original.)   Three days later, Plaintiff's counsel moved to withdraw their appearance from the case.[8]

On November 2, 2021, defense counsel requested another conference with Judge Bennett to discuss an "urgent and on-going discovery dispute."  (ECF No. 44.)  That same day, Judge Bennett referred the case to Magistrate Judge J. Mark Coulson to resolve all discovery disputes. (ECF No. 45.)  On November 19, 2021, Alutiiq filed its Motion for Sanctions and Dismissal (ECF No. 50), which went before Judge Coulson pursuant to 28 U.S.C. § 636.  In its Motion for Sanctions and Dismissal, Alutiiq contends that Mr. Gunter falsified several text messages he produced in support of his claims. (ECF Nos. 50-5 thorough 50-8, reproducing what Alutiiq contends are the fraudulent text messages as well as the authentic versions).  Alutiiq argues that the court should dismiss this action as a sanction for Mr. Gunter's misconduct and award Alutiiq the fees and costs it incurred to investigate his misconduct and seek relief from the court.

---

[8] Mr. Gunter was represented by counsel at all times until immediately following his deposition.  On September 13, 2021 – three days following his deposition, the conference with Judge Bennett and Judge Bennett's Letter Order directing Mr. Gunter to turn over his phone that very day – Mr. Gunter's attorneys notified him of their intention to withdraw as counsel.  With Mr. Gunter's consent, his counsel moved to withdraw from the case, which motion was granted. Mr. Gunter has since proceeded without counsel. (ECF Nos. 40 and 41.)  Although Mr. Gunter has proceeded unaided by counsel since September 29, 2021 (*see* order granting motion to withdraw at ECF No. 41), it bears mentioning that during the period of discovery that forms the foundation of the instant motions, and the court's consideration of Mr. Gunter's conduct as a litigant in this court, Mr. Gunter had the benefit of multiple able and experienced counsel at all times relevant to the matters now before the court.  Thus, to the extent self-represented litigants are generally held to a less rigorous standard than those represented by counsel, the court does not afford Mr. Gunter such grace until following the withdrawal of his counsel. In any event, while self-represented litigants are held to a less rigorous standard than represented parties with respect to court filings and the like, surely all those who come before the court – be they aided by counsel or proceeding *pro se* – are held to the same standard regarding candor to the court and good faith conduct during the course of litigation. No party is entitled to skirt these elementary expectations.

On December 28, 2021, Judge Coulson issued his Report and Recommendation (ECF No. 53) on Alutiiq's Motion for Sanctions and Dismissal (ECF No. 50).[9]  Alutiiq filed objections to the Report and Recommendation to which Mr. Gunter responded (ECF Nos. 54, 56).  Pursuant to Federal Rule of Civil Procedure 72(b) and Local Rule 301.5.b, on April 14, 2022, Judge Bennett conducted an evidentiary hearing at which Alutiiq's forensic examiner testified; the parties also presented oral argument regarding what effect, if any, the examiner's testimony ought to have on Judge Bennett's consideration of Judge Coulson's Report and Recommendation and his ruling on the Motion for Sanctions and Dismissal.  Thereafter, as described in the Introduction, *supra,* Judge Bennett adopted in part and modified in part the Report and Recommendation, granted in part and denied in part Alutiiq's Motion for Sanctions and Dismissal at ECF No. 50, and directed Alutiiq to file a fee petition.  (ECF Nos. 67 and 68.)

As set forth above, following the transfer of this action to the undersigned, the court has considered whether to revise its ruling on these matters.  What follows is the court's analysis of these serious matters.

## III.   ANALYSIS

### A.   Applicable Law

#### 1.   *Sua Sponte* Reconsideration

"An interlocutory order is subject to reconsideration at any time prior to entry of a final judgment." *Fayettville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991). Further, it is within the court's inherent discretion to review an interlocutory order for reconsideration at any time prior to the entry of a final judgment – whether on motion of a party

---

[9] As relayed above in the Introduction, because Alutiiq's motion requested dispositive relief (and did not pertain solely to a discovery dispute), Judge Coulson issued a Report and Recommendation for the court to consider in the disposition of the motion.

or *sua sponte. Id.* at 1472; *see also Amer. Canoe Assoc., Inc. v. Murphy Farms, Inc*., 326 F.3d 505 (2003) (citing *Fayettville Investors v. Commercial Builders, Inc*., 936 F.2d 1462, 1469 (4th Cir. 1991)) (holding that "a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted."); *McDevitt v. Wellin,* No. 2:13-cv-3595, 2104 WL 7146967, *2 (D.S.C. Dec 14, 2014)(same); *Thomas v. Andino,* No. 3:20-cv-01552, 2020 WL 6324155, *2-*3 (D.S.C. Oct. 28, 2020)(same).

As set forth above in the Introduction, following transfer of this case from Judge Bennett to the undersigned judge on April 29, 2022, this court took care to learn the record of the case before adjudicating the Motion at ECF No. 71, which was filed pursuant to Judge Bennett's order at ECF No. 68.   Upon a comprehensive record review, the court came to appreciate that the fraudulent text messages that Plaintiff relied upon to state his claims in the Complaint, produced in discovery, and then testified at deposition were complete and genuine, go to the heart of the merits of Plaintiff's claims (and Defendant's defenses). The intentional and egregious nature of Plaintiff's conduct, which demonstrates a disregard of the Federal Rules of Civil Procedure and a willingness to commit fraud on the court to prevail and receive an award of monetary damages, not to mention the resultant material injurious effect upon Defendant, shocked the conscience of the court – so much so that the court questioned whether it could, in good conscience, submit any of Plaintiff's evidence or testimony to a jury.   In other words, Judge Bennett exercised his discretion, as was his entitlement, to allow Plaintiff to proceed to prove his case constrained by the conditions described at ECF No. 67.   But the undersigned was given grave pause to consider whether it could, as the gatekeeper of evidence and steward of the case, continue along the same path.   The court, therefore, elected to exercise its discretion to review anew the motion at ECF No.

50 (and Judge Coulson's Report and Recommendation at ECF No. 53), but not before advising the parties at the conference held October 6, 2022, and inviting them to be heard and to supplement the record through additional briefing regarding their respective positions.  The court appreciates that these conditions – created by the transfer of a case from one judge to another – are unusual. Surely, however, the undersigned has no less authority or discretion than did the preceding judge; nor is that authority or discretion diminished by virtue of the circumstances through which this court came to preside over this case.

## 2.   Review of Judge Coulson's Report and Recommendation

When reviewing a magistrate judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The court reviews *de novo* any portions of the Report and Recommendation to which a specific objection is made, but may adopt, without explanation, any of the magistrate judge's recommendations to which no objection is filed. *Solis v. Malkani*, 638 F.3d 269, 274 (4th Cir. 2011) (citing *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983)). A district court may also receive further evidence in connection with its review of a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); *Doe v. Chao,* Nos. 00-2247, 00-2292, 2002 U.S. App. LEXIS 28140, at *26 n.9 (4th Cir. Sep. 20, 2002).

As set forth in Judge Bennett's memorandum opinion at ECF No. 67:

On January 11, 2022, Alutiiq filed timely objections to Judge Coulson's Report and Recommendation. (ECF No. 54.) Alutiiq requested that it be permitted to engage a forensic expert to examine the cell phones and data in question and to present any findings to this Court at an evidentiary hearing. Gunter opposed further discovery on the matter of the allegedly fraudulent text messages. (ECF No. 56.) This Court determined that it would receive further evidence on the allegedly fraudulent text messages and permitted a 45-day period of discovery during which Alutiiq would have the opportunity to engage a forensic expert. (ECF Nos. 55, 57.) On March 3, 2022, Alutiiq provided a status report to the Court noting that the 45-day period had run and attaching the report of its expert, J. Christopher Racich of Vestigant LLC. (ECF No. 58.)

As did Judge Bennett, this court credits the testimony of Mr. Racich in its entirety, which is to say that the court finds by clear and convincing evidence that the text messages described above at ECF Nos. 50-2 and 50-4 (dated July 29, 2019, and August 20, 2019, respectively; authentic versions at ECF Nos. 50-3 and 50-5, respectively) are not genuine. They are, in the words of Judge Bennett, "in fact fraudulent." The court finds clear and convincing evidence that Mr. Gunter intentionally and knowingly created false, fraudulent documents on which he relies to state and prove his claims to this court, and which he produced in discovery for that purpose. Further, the court finds by clear and convincing evidence that Plaintiff engaged in the intentional, wholesale spoliation (*i.e.,* deliberate deletion and failure to produce) of six text messages dated August 31 to September 5, 2019. (*See* spoliated text messages obtained through forensic examination of Plaintiff's cell phone at ECF No. 50-1 and 9-11.)

### 3. Authority to Impose Sanctions

The court has the authority to dismiss an action as a sanction for misconduct by way of several Federal Rules of Civil Procedure, as well as by virtue of the court's inherent authority to manage and oversee the cases over which it presides. As a general matter, the court should invoke and abide the parameters of its rule-based authority instead of relying upon the more fluid, if not broader, nature of its inherent discretion and authority. *Chambers v. ASCO, Inc.,* 501 U.S. 32, 50 (1991) (holding that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."). The applicable rules and common law addressing these sources of authority are set forth below, following which the court will address the particulars of the instant case.

a.      **Federal Rules of Civil Procedure**

i.      **Federal Rule of Civil Procedure 26(g)**

Federal Rule of Civil Procedure 26(g) provides:

(g) Signing Disclosures and Discovery Requests, Responses, and Objections.

(1) *Signature Required; Effect of Signature.* Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented--and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

(2) *Failure to Sign.* Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention.

(3) *Sanction for Improper Certification.* If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

FED. R. CIV. P. 26(g).

Importantly, under Rule 26(g)(3), sanctions are mandatory upon a finding of a certification violation. The nature of the "appropriate" sanction is discretionary, but whether to impose a sanction is not. Further, while the rule expressly provides that a monetary sanction may be imposed, the court's authority is not limited to expenses and fees; rather, the court must impose

what it determines is an appropriate sanction to deter the bad actor as well as those who may be inspired or encouraged by his misconduct to act similarly.

The 1983 Advisory Committee Notes to Rule 26 explain that "Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it" and that "[t]he nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances." FED. R. CIV. P. 26(g) advisory committee's note to 1983 amendment. Importantly, the Committee Notes instruct that the objective of Rule 26(g) sanctions is "'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Id.* (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)); *see also Johnson v. N. Carolina Dep't of Just.*, No. 5:16-CV-00679-FL, 2018 WL 5831997, at *12 (E.D.N.C. Nov. 7, 2018) (reviewing 1983 Advisory Committee Notes regarding Rule 26(g)(3) sanctions).

### ii.      Federal Rule of Civil Procedure 37(c)(1)

Federal Rule of Civil Procedure 37(c)(1) provides:

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.
(1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
(B) may inform the jury of the party's failure; and
(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

FED. R. CIV. P. 37(c)(1).

Pursuant to Rule 37(c)(1), upon a party's failure to provide, disclose, or supplement documents and electronically stored information ("ESI") within that party's possession, custody,

or control, and which the party may use to support his claims per Rule 26(a)(1)(A)(ii), on motion

and after providing the parties an opportunity to be heard, the court may dismiss the action per

Rule 37(b)(2)(A)(v) upon a determination that dismissal is warranted.[10]  The court employs a four-

part test to determine the appropriate sanction under Rule 37.

> The court must determine (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective.

*Anderson v. Found. For Advancement, Educ. & Employment of Am. Indians*, 155 F.3d 500, 504

(4th Cir. 1998); *Belk v. Charlotte-Mecklenburg Bd. Of Educ.,* 269 F.3d 305, 348 (4th Cir. 2001).

### iv.     Federal Rule of Civil Procedure 41(b)

Federal Rule of Civil Procedure 41(b) provides:

> (b) Involuntary Dismissal; Effect. If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits

FED. R. CIV. P. 41(b).

Pursuant to Rule 41(b), whether on motion of a party or *sua sponte*, the court may

involuntarily dismiss an action for failure to comply with the Federal Rules of Civil Procedure or

an order of court.  *Attkisson v. Holder,* 925 F.3d 606, 625 (4th Cir. 2019)(citing *Link v. Wabash R.*

*Co.*, 370 U.S. 626, 629-31 (1962), and holding that a court may act on its own to dismiss for failure

to prosecute under Rule 41(b), because the power to dismiss under 41(b) is rooted in a court's

inherent authority to manage its docket and the disposition of cases).  The United States Supreme

---

[10] The court has determined that sanctions under Rule 37(e)(2)(C) for Mr. Gunter's spoliation of text messages (a "failure to preserve" ESI under the rule) are not appropriate because the spoliated text messages have been "replaced through additional discovery" by way of Mr. Caster's cell phone.  FED. R. CIV. P. 37(e) "Failure to Preserve Electronically Stored Information."

Court has clarified that, although Rule 41 expressly articulates the court's power to dismiss as a sanction for failure to prosecute or to comply with the Federal Rules, the rule is not the source of that power.  Instead, "the power is of ancient origin."  *Link,* 370 U.S. at 629-30; *Attkisson*, 925 F.3d at 625 (citing *Link* for this purpose).

In recognition of the severity of dismissal as a sanction, the Fourth Circuit has "identified four criteria that guide a district court's discretion in dismissing a case under Rule 41(b).  Such an exercise should weigh: '(1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal.' *See Hillig v. C.I.R.*, 916 F.2d 171, 174 (4th Cir. 1990). Those criteria, however, 'are not a rigid four-prong test.' *See Ballard v. Carlson*, 882 F.2d 93, 95 (4th Cir. 1989) (Powell, J.).  Rather, the propriety of an involuntary dismissal ultimately depends on 'the facts of each case,' which we review to determine 'whether the trial court exercised sound discretion.' *See Reizakis v. Loy*, 490 F.2d 1132, 1135 (4th Cir. 1974); *see also Link*, 370 U.S. at 633, 82 S. Ct. 1386." *Attkisson*, 925 F.3d at 625.

### v.  Inherent Authority

In addition to the sanctioning authority expressly provided by various Federal Rules of Civil Procedure, the court has inherent authority to sanction a party for failure to comply with the court's rules and orders.  *Link* and *Attkisson, supra.*  "Under [its] inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions."  *United States v. Shaffer Equip. Co*., 11 F.3d 450, 461-62 (4th Cir. 1993).  Specifically, "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process,

the court has the inherent power to dismiss the action." *Id.* at 462.  Because this power is "organic, without need of a statute or rule for its definition . . . it must be exercised with the greatest restraint and caution, and then only to the extent necessary." *Id.* at 461-62.

> Mindful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction, a court must not only exercise its inherent power to dismiss with restraint, but it may do so only after considering . . . the following factors: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 462-63 (citations omitted).

Further, when invoking its inherent power to impose the sanction of dismissal with prejudice, the sanction must be supported by "'clear evidence of misconduct and a high degree of specificity in the factual findings.' . . . The Court must find 'willfulness, bad faith, or reasonably serious fault,' . . . and must also consider 'whether a lesser sanction would [be] appropriate.'" *Rossbach v. Montefiore Med. Ctr.,* No. 19-cv-5758, U.S. Dist. LEXIS 147013, *16 (S.D.N.Y. Aug. 5, 2021) (citations omitted; quoting *Mitchell v. Lyon Pro. Servs., Inc.,* 708 F.3d 463, 467 (2d Cir. 2013), and *Shepard v. Annucci*, 921 F.3d 89, 98 (2d Cir. 2021)).

### B.    Application of the Law to the Instant Case

As set forth above, a violation of the certification requirement of Rule 26(g)(3) mandates the imposition of an appropriate sanction.  Under Rules 37(c)(1) and 41(b), and pursuant to the inherent authority with which the court is vested, the court may sanction a party for wrongful conduct, including dismissing the action with prejudice.  Several factors must be considered and, at all times, the court must ensure that due process is afforded the offending party.

### 1.   Due Process

Importantly, Mr. Gunter has at all times throughout this action been afforded ample notice and an opportunity to be heard, orally and in writing, regarding the court's consideration of Alutiiq's request that the action be dismissed and that it be awarded attorney's fees and costs as a sanction for his wrongful conduct described in this memorandum.  In addition to submission of papers for the court's consideration, including the court's invitation of supplementary briefing following the conference of October 6, 2022, at the evidentiary hearing on April 14, 2022, Mr. Gunter was afforded the opportunity to call witnesses on his behalf, to cross-examine Alutiiq's expert forensic examiner, and to make oral argument.

### 2.   Factors to Consider Under Rules 37 and 41, and Inherent Authority

#### a.   Prejudice to the Judicial Process, the Administration of Justice and Alutiiq

There can be no greater violence to the administration of justice than the creation of fraudulent evidence and the destruction of authentic evidence.  Mr. Gunter's reprehensible conduct has resulted in the expenditure of many thousands of dollars by Defendant in the form of attorney's fees and expert costs, and no doubt an emotional toll upon the human beings that make up Alutiiq, including most notably Mr. Zachary Caster, Mr. Gunter's former supervisor at Alutiiq and the other party to the text messages Mr. Gunter falsified and destroyed.

Further, the court has expended countless hours of judicial resources[11] dedicated to safeguarding the judicial process from Mr. Gunter's dishonesty.  And this expenditure of resources carries with it considerable opportunity cost, because while the court is focused on determining what best to do when confronted with a party who seeks to distort the judicial process for his

---

[11] Judicial resources are not limited to the judge.  They include law clerks and assistants, court reporters and courtroom deputies, U.S. Marshals and other security.  Mr. Gunter's actions have drawn the effort and attention of the entire cadre of courthouse civil servants.

personal gain at the expense of others, the court is not focused on the resolution of other peoples' cases.

### b.    Bad Faith and Personal Responsibility/Culpability

As set forth above, upon review of Mr. Gunter's deposition testimony, Mr. Racich's expert opinion, and the claims and allegations of the Complaint, the court is overwhelmingly persuaded by clear and convincing evidence that Mr. Gunter engaged in a deliberate, knowing, and intentional scheme to create false documents on which to base his claims, and destroyed other documents that he deemed unhelpful to his cause.   The merits of his claims are rooted in the distorted reality he created by virtue of his dishonest acts.    He testified at length at deposition disavowing responsibility or accountability for the fraudulent messages, and brazenly called upon Alutiiq to "prove it."  He sought to cast blame on others for the missing and edited text messages – suggesting Verizon was responsible for the missing portions of messages and also that secret government agents "seized" his phone and took it to a "suspicious van" to do with it what Mr. Gunter could not say.   Still later, Mr. Gunter took the position that the authentic text messages produced by Alutiiq were in fact fraudulent and that the fraudulent text messages he produced were authentic; and he asserts that expert forensic examiner Mr. Racich "repeatedly lied on the witness stand." (ECF No. 74 at p. 2.)

Finally, as described above in footnote 4, *supra* page 6, after Judge Bennett expressly found that Mr. Gunter engaged in an "egregious" fraud on the court and instructed him not to misrepresent to the court that the government "sanctifies" his case, Mr. Gunter demonstrated with searing clarity to this court that he does not countenance rules of candor to the tribunal and ethical conduct in litigation by availing himself of the opportunity to persuade a different judge that the federal government "supports" his case.

Mr. Gunter's misconduct in creating false documents and spoliating evidence generally is borne entirely of his bad faith effort to contort the judicial process on a false premise for his financial gain.   He, and he alone, is personally culpable for this course of conduct.

### c.       Need for Deterrence

The need for deterrence is strong on two fronts.  First, it is critical for the court to dissuade and discourage others from acting in a like manner as Mr. Gunter.  Particularly in a time in our lives when creating false documents and photos seems ever easier and accessible to anyone with a computer, the court must be a particularly stalwart guardian of the sanctity of its purpose and process; and, in so doing, to communicate to all who might be tempted by Mr. Gunter's example that the court is closed to dishonesty.

Second, the need to deter Mr. Gunter personally is paramount.  As described above, Mr. Gunter has demonstrated that he lacks contrition or anything of the sort; instead, he continues to assert he lacks responsibility or fault for his misdeeds, and blames others.  Further, Mr. Gunter has demonstrated that he "doubles down" instead of correcting his behavior when confronted or exposed.  These observations of the court weigh heavily in the court's final decision-making as to the appropriate sanction.

### d.       Effectiveness of Less Drastic Sanction, Policy of Trying Cases on the Merits, and Public Interest

The court considers with great weight the strong policy in favor of trying cases on their merit and appreciates that airing Mr. Gunter's claims before a jury in accordance with the limits posed by Judge Bennett (at ECF Nos. 67 and 68), or others, might produce some deterrent effect – as Judge Bennett had determined to disallow Mr. Gunter from relying on the fraudulent text messages and to allow Alutiiq to impeach his credibility with them.  In the eyes of this court, such a sanction is inadequate to address myriad concerns of the court.

It should go without saying that Mr. Gunter would not be entitled to rely on documents (ECF Nos. 50-2 and 50-4) the court determines are inauthentic; in the eyes of this court, that presents no sanction at all.  A financial sanction, too, is woefully inadequate to address Mr. Gunter's misconduct such that the case could be heard on the merits.  As set forth in sections III(B)(2)(b) and (c), above, Mr. Gunter has demonstrated that he is utterly unperturbed by the court's finding that he engaged in an "egregious" fraud on the court – and, instead, since Judge Bennett so found, Mr. Gunter has continued to make misrepresentations to the court and to accuse others of responsibility for his own unethical conduct.  As a result, the court cannot with anything approaching comfort or confidence admit evidence or testimony offered by Mr. Gunter for a jury's consideration.  The notion that the court would call upon the citizens of Maryland to serve on a jury to consider a body of evidence about which the court has grave doubts regarding authenticity is anathema to the jury trial system and the administration of justice in its entirety.

### 3.    Mr. Gunter's Violation of Rules 12, 37 and 41

Based on Mr. Gunter's conduct as described in detail above, the court finds that Mr. Gunter violated the certification requirement of Rule 26(g)(3).  Further, the court finds that Mr. Gunter violated Rule 37(c)(1)(C) by failing to provide, disclose or supplement the ESI within his possession, custody, and control, and on which he based his claims (per Rule 26(a)(1)(A)(ii)).

Regarding Rule 41(b), the court finds that Mr. Gunter failed to comply with Rule 26(a)(1)(A)(ii)[12] and 26(g)(1)(A) and (B).[13]

### a.        Dismissal is the Appropriate Sanction

In view of the court's analysis of the particular facts of this case as well as all policy considerations and factors set forth above, the court finds that dismissal of this action with prejudice is the appropriate sanction, and that no less drastic sanction is adequate or appropriate.

---

[12] Rule 26(a)(1)(A) provides:

(a) Required Disclosures.

(1) *Initial Disclosure.*

(A) *In General.* Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment; . . . .

[13] Rule 26(g)(1) provides:

(g) Signing Disclosures and Discovery Requests, Responses, and Objections.

(1) *Signature Required; Effect of Signature.* Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented--and must state the signe's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

*See, e.g., Pope v. Federal Express Corp.,* 974 F.2d 982, 984 (8th Cir. 1992) (affirming dismissal of Title VII action and imposition of fees as Rule 41(b) sanction upon finding of "knowingly presenting and relying on a falsified document"); *Vargas v. Peltz,* 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) (holding that "Plaintiff's intentional misconduct in presenting false evidence in support of her claims compels dismissal of this case"); *Rossbach v. Montefiore Med. Ctr.,* No. 19-cv-5758, U.S. Dist. LEXIS 147013, *16 (S.D.N.Y. Aug. 5, 2021) (finding that dismissal "is the only appropriate sanction" upon finding willful falsification of documents to support a sex harassment lawsuit was an "'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate the action.'")(quoting *Yukos Cap. S.A.R.L. v. Feldman,* 977 F.3d 216, 235 (2d Cir. 2020)).

### C.    Reconsideration of Judge Coulson's Report and Recommendation

For the foregoing reasons, the court adopts in part and modifies in part Judge Coulson's Report and Recommendation as follows: the court adopts Judge Coulson's conclusion that the court should impose a sanction upon Mr. Gunter for his spoliation of evidence (*see* ECF No. 53 at pp. 10-11; spoliated text messages at ECF Nos. 50-1 and 50-9 through 50-11; and FED. R. CIV. P. 26(g)(3) and 37(c)).  The court modifies Judge Coulson's conclusion as to his inability to determine the authenticity of the text messages at ECF 50-2 and 50-4 based on forensic evidence not then available to him (and based on his conclusion that authenticity is a determination best left to the trial judge).  The court, as explained above, credits without exception Mr. Racich's expert opinion and finds, clearly and convincingly, that the text messages at ECF Nos. 50-2 and 50-4 are inauthentic and the product of Mr. Gunter's targeted deletions to generate false evidence in support of his claims.

Given the wealth of evidence now before the court, and not available to Judge Coulson, the court further modifies Judge Coulson's ultimate recommendation that dismissal of this action is not warranted and, therefore, that the court should grant in part and modify in part Alutiiq's Motion for Sanctions and Dismissal. Based on the court's conclusion that dismissal of this action is warranted as a sanction for Mr. Gunter's misconduct, and that no lesser sanction is appropriate, the court will grant the Motion for Sanctions and Dismissal by dismissing this action with prejudice in accordance with Federal Rules of Civil Procedure 26(g)(3), 37(c)(1)(C), and 41(b) and the inherent authority of this court; and by requiring that Mr. Gunter pay reasonable attorneys' fees and costs associated with Mr. Racich's engagement and services subject to Mr. Gunter's capacity to pay, which the court addresses below.

### D.     Mr. Gunter's Capacity to Pay as Requested in ECF No. 71

The court must evaluate a party's capacity to pay fees/costs before ordering the payment of same. *See, e.g., Salvin v. Amer. Nat'l. Ins. Co.,* 281 Fed Appx. 222 (4th Cir. 2008), and cases cited therein, regarding consideration of capacity to pay in context of Rule 11 sanctions. Plaintiff bears the burden of proving his financial status and evidencing inability to pay the sanctions. *In re Kunstler,* 914 F.2d 505, 524 (4th Cir. 1990) (explaining that a party's contention that it is unable to pay a financial sanction "should be treated as reasonably akin to an affirmative defense, with the burden upon the parties being sanctioned to come forward with evidence of their financial status."). The court has considered materials submitted by Mr. Gunter, as well as Alutiiq's response in opposition. (ECF Nos. 73-75.)

Based on this court's review of all exhibits submitted to the court by Mr. Gunter, the court concludes that Mr. Gunter's assets exceed his liabilities, and that his monthly income exceeds his expenses as presented. Further, Mr. Gunter receives unemployment benefits but has not identified

or claimed an inability to work by way of disability or the like, and offers no basis for the court to conclude that he is unable to obtain or maintain employment.  Mr. Gunter's background as alleged in his Fourth Amended Complaint suggests he has broad employment potential.[14]  Further, Mr. Gunter owns an S-Class Mercedes and a home, subject to loan and mortgage obligations, earns social security benefits as a surviving spouse ($1,193 monthly), and retains cash deposits of approximately $3,000 as of the date of his filing (which he declined to supplement).  Further, Mr. Gunter's federal tax return for the year ended 2022 estimates a refund of approximately $4,400.  Mr. Gunter's reported monthly expenses include approximately $200 per month for mortgage (with a past-due balance of nearly $4,300); a second monthly mortgage of approximately $1,700, $500 per month in credit (credit lines and credit card), and a $277 monthly car payment.

The court, therefore, finds that Mr. Gunter is capable of paying the costs associated with the forensic image of Mr. Gunter's cell phone pursuant to Judge Bennett's order (ECF No. 39) in the amount of $1,125 (ECF No. 71 at p. 3, and exhibits at ECF Nos. 71-1 and 71-5), as well as a portion of Mr. Racich's expert forensic services which totaled $13,577.38 (and which Alutiiq has in fact incurred and paid, *Id.* at 71-2.).  The court is persuaded further that Mr. Gunter does not have the capacity to pay in excess of $10,000 as a financial sanction, and therefore declines to award Defendant the attorney's fees requested or the entirety of costs associated with engagement of expert services.  Therefore, in addition to dismissing this action with prejudice, the court will require that Mr. Gunter pay Alutiiq (through counsel) the sum of $10,000.00.

---

[14] "In addition to his service in the military, Mr. Gunter had decades of experience in law enforcement, security, and protecting military and government assets. He spent years working as an armed guard protecting the Army's Asymmetric Warfare Group in Ft. Meade, Maryland. He guarded the Social Security Administration headquarters building. He also was an officer for the Anne Arundel County Police and Sheriff Department, among other jobs and assignments.  He was one of Alutiiq's most experienced Access Control Officers."  (ECF No. 35, Fourth Amended Complaint, at ¶¶ 23-24.)

**IV.     CONCLUSION**

For the reasons set forth herein, by separate order, the court vacates the order at ECF No. 68; adopts in part and modifies in part the Report and Recommendation at ECF No. 53; upon *sua sponte* reconsideration, grants the Motion at ECF No. 50; grants in part and denies in part the Motion for Fees and Costs Arising from Order of Sanctions (ECF No. 71); directs Plaintiff to pay $10,000.00 to Defendant as partial reimbursement of costs associated with the engagement of forensic and expert witness services; dismisses this action with prejudice as a sanction for Plaintiff's misconduct and fraud upon the court; and respectfully directs Madam Clerk to close this case.

<u>Julie R. Rubin /S/</u>
United States District Judge

March 2, 2023